IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division
CRIM. NO. 2:24-cr-00088-001

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) **DEFENDANT'S POSITION** |
| | ) **REGARDING SENTENCING** |
| JEFFREY RADTKE, | ) |
| Defendant. | ) |

Pursuant to LR 83.10 (e) of the Local Rules of this Court, Defendant, Jeffrey Radtke, ("Mr. Radtke") submits his position regarding sentencing in the above referenced matter.

**Motions for Downward Departure(s) and Variance:**

Simultaneous with the filing of this Position Paper, Mr. Radtke has filed Motions for a Downward Departure and a Motion for Variance below the Guidelines range.

**Objections/Additions to the Presentence Investigation Report:**

Mr. Radtke interposed a number of objections and additions to the preliminary Presentence Investigation report. Most objections and additions have been resolved in the final Presentence Investigation report ("PSR.").

These are the additions that are outstanding:

1. Paragraph 16: Mr. Radtke does not object to any factual statements contained in this paragraph, but believes the following information was omitted and should be included: Mr. Radtke was informed that an agent was at his residence with a search warrant pertaining to his electronics. An agent informed Mr. Radtke that providing his computer password would show his level of honesty and cooperation. Mr. Radtke then willingly provided his computer password to the agent. Mr. Radtke also willingly provided his cell phone passcode to agents.

1

Mr. Radtke was initially interviewed at the private college preparatory school at which he worked. The day after this initial interview, Mr. Radtke's supervisor called the agent, asked the agent if Mr. Radtke posed any threat to children, and the agent replied, "No, he does not."

2. Paragraph 20: Mr. Radtke does not object to any factual statements contained in this paragraph but believes the following information should be included: When Mr. Radke began discussing his abusive childhood, he became tearful and emotional. When a question was posed to Mr. Radtke regarding why he committed the instant offense, he explained that it was due to the self-hate he developed from childhood trauma, specifically the physical and emotional abuse by his mother and sexual abuse by a family member, (not in his immediate family.) When he viewed the materials in question, he saw himself in the monkeys as they were being tortured. He believed that he was worthless and also was deserving of such torture and death.

3. Paragraph 63: Mr. Radtke does not object to any factual statements contained in this paragraph but believes the following information should be included: While enlisted in the United States Army, Mr. Radtke had no record of misconduct, as evidenced by him receiving the Good Conduct Medal on more than one occasion.

These are the outstanding objections to address:

1. Paragraph 27: As discussed below, Mr. Radtke was not an organizer or leader, and his offense level should not be increased by four levels pursuant to 3B1.1(a).

2. Paragraph 32: A 2-level downward adjustment for certain zero-point offenders applies because Mr. Radtke meets the criteria set forth in USSG §§ 4C1.1(a)(1)–(11).

3. Paragraph 29: The correct adjusted offense level (subtotal) should be 19.

4. Paragraph 33: The correct total offense level should be 16.

5. Paragraph 67: The correct guidelines provisions for custody should be 21-27 months. The correct fine rage should be $5,000 to $50,000.

6. Paragraph 68: Mr. Radtke believes that pursuant to USSG § 5K2.0, the following factors should warrant a departure from the applicable guideline range: Mr. Radtke's childhood trauma as a result of the emotional and physical abuse he suffered, his resulting diagnoses of PTSD and his honorable military service in the armed forces.

**I.  Mr. Radtke was not an organizer or leader, and his offense level should not be increased by four levels pursuant to 3B1.1(a).[1]**

These arguments demonstrate why the "leader/ organizer" upward adjustment does not apply, but they also highlight how in the rubric of the conspiracy, Mr. Radtke was a relatively "low level" player, which justifies his motions for departures and variances as argued below.

The commentary to USSG § 3B1.1 states that, to qualify for the adjustment, Mr. Radtke must "have been the organizer, leader, manager, or supervisor of one or more other participants" or "who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." USSG § 3B1.1, cmt. 2. The relevant factors courts are to consider are "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." USSG § 3B1.1, cmt. 4.

These factors weigh against applying the role enhancement to Mr. Radtke but weigh in favor of granting his motions for departure and variance. He exercised no decision-making authority over the trading group in which he was a member. The nature of his participation was the same as that of every other member of the group. He did not recruit members or accomplices. He did not claim a "right to a larger share of the fruits of the crime" than others. Mr. Radtke made no profit or financial gain. Mr. Radtke's "participation in planning or organizing the offense" was substantially similar to other participants, in that he paid for and commissioned videos. Mr. Radtke exercised no more control or authority over other members compared to his fellow participants.

There is no evidence that Mr. Radtke managed or supervised people. See *United States v. Kimmel*, 644 F. App'x 231, 234 (4th Cir. 2016) (non-precedential) ("These factual findings …

---

[1] The defense learned on the date of this filing (January 30, 2025) that it will be the United States' position at the sentencing hearing that Mr. Radtke should **not** receive a role adjustment under USSG § 3B1.1.

3

certainly demonstrate that Kimmel played a significant role in the extensive fraudulent scheme. Yet these facts do not establish that Kimmel ever managed or supervised people, which is a necessary finding to support the enhancement."); *United States v. Cameron*, 573 F.3d 179, 185 (4th Cir. 2009) (rejecting government's argument that the enhancement was warranted given defendant's "integral role as the manufacturer of the bills effectively gave him the authority to control the flow of the bills to the other participants" because that argument "conflates the potential to exercise control over an operation with the actual exercise of control") (emphasis in original); *United States v. Slade*, 631 F.3d 185, 191 (4th Cir. 2011) ("[W]hile various co-conspirators sold drugs 'for' Slade …this record does not support the conclusion that Slade was exercising authority over other coconspirators or managing the conspiracy's activities. In light of the absence of any evidence of Slade's aggravating role as a manager or supervisor, the district court erred in enhancing his offense level under USSG § 3B1.1(b)."); *United States v. Sayles*, 296 F.3d 219 (4th Cir. 2002) (holding that a two-point enhancement, pursuant to 3B1.1(c), was not warranted where it had not been established that the defendant had functioned as an organizer, leader, manager or supervisor of criminal activity).

The nature of the trading groups is further evidence that Mr. Radtke was an average participant. Mr. Radtke and his fellow participants utilized a private online chat group via an encrypted messaging platform called, "Telegram." According to Telegram, "Telegram groups are democratic by design. Everyone can invite new members and change the group's name and photo, which is ideal for small bands of friends and co-workers." Telegram, "Admins, Supergroups, and More," available at https://telegram.org/blog/supergroups. "By default, all members are still in control." Id. This was the case for the group in which Mr. Radtke was member. Every other member of the group had the power, and did in fact change the group's name and appearance, request or collect funds, and share or create content, consistent with the default settings for a Telegram group. Mr. Radtke did not exclusively curate content, continuously control the group's membership, or

direct the group's finances. Mr. Radtke was himself kicked out of at least one of the Telegram groups in which he was a member. The name of the Telegram groups would change, suggesting that another participant was responsible for changing the names.

The only justification provided for this role enhancement in the PSR was that Mr. Radtke "had his own trading group of five or more participants and was directly paying the videographer in Indonesia." PSR at 8. Mr. Radtke was a member of a trading group but held no leadership or managerial role within this group. Instead, Mr. Radtke was a member of the group on similar footing as any other member as detailed above.

Mr. Radtke directly paying the videographer in Indonesia is not evidence of any leadership or management role. At the outset, it is unclear why or how "directly paying" the videographer is evidence that Mr. Radtke was a leader or organizer within the conspiracy. By way of analogy: a member of a drug trafficking organization may have the role of "directly paying" other members of the conspiracy for illicit substances, but "directly paying" a co-conspirator is hardly evidence of leadership. In fact, it may tend to show a relative low position within the organization.

Additionally, directly transferring funds to the videographer was not unique to Mr. Radtke; In fact, defendant Kenneth Herrera, who was sentenced most leniently of those sentenced so far, commissioned a torture video and sent money to an Indonesian person, just as Mr. Radtke has done. So clearly, other courts have found that membership in a trading group and directly paying a videographer does not qualify a person for a role enhancement. Because to do so, courts would then be required to give the upward adjustment to the vast majority of participants. This would then controvert the Guidelines' purpose of the adjustment that seeks to address "concerns of relative responsibility." USSG § 3B1.1, cmt. Background. When Mr. Radtke did transfer money, the evidence shows that he did so "immediately" upon receiving it from another source. (*See* Attachment 1.) This suggests not that he was exercising any discretion or management role over these funds, but

5

rather that he acted more as a pass-through conduit.

The available records of the Telegram groups of which Mr. Radtke was a member along with his fellow participants shows that *other* participants did manage the group by kicking-out members for breaking rules (Exhibit 1, page 1, 5), communicate to the group the vision and mission of the group (Exhibit 1, page 2, 8), and solicit members of the group to join other illicit groups (Exhibit 1, page 3, 4, 6-7). Mr. Radtke did none of these things.

From what the defense can ascertain, only two members of the conspiracy have received an aggravating role enhancement under USSG § 3B1.1: Nicole Danielle Devilbiss and Michael Macartney. In *United States v. Devilbiss*, Case No. 23-CR-(S1)-153 WWB-LLL (M.D. Fl. 2023), Ms. Devilbiss was chosen to be an administrator of the Telegram group. In this leadership role, she exercised the ability to deny other users access to the group, advocated for and enforced rules of the group, and moderated content shared within the group. The following is one example of a message she sent to her group:

> "Anyone in this group watching the content that's posted and choosing not to communicate will be removed. I'm sick and fuckin tired of the high school gossiping bullshit. You're all fuckin adults and I'm not having it anymore. [C1] has become a very good friend to me and has done anything and everything [C1] can for us all! [C1] isn't the one that should be gone and as much as I want [C1] to stay, I have no control over it. I do, however, have control to remove those of you that lurk in the shadows. Time to go!"

*United States v. Devilbiss*, Case No. 23-CR-(S1)-153 WWB-LLL (M.D. Fl. 2023), Dkt 59 at 15.

In *United States v. Macartney*, Case No. 24-CR-25 EWH-LRL (E.D. Va. 2023), Michael Macartney, known as the "Torture King," was the leader in the online groups which he created. Mr. Macartney controlled the groups, invited people to join the groups, and defined roles for members in the group. *United States v. Macartney*, Case No. 24-CR-25 EWH-LRL (E.D. Va. 2023), Dkt 29 at 4-5. (See also Exhibit 2: Search Warrant Application for Macartney.) Mr. Macartney's prolific role was even highlighted in a BBC article which called him the "ringleader of a global monkey torture

6

network."[2]

Mr. Radtke's actions did not rise anything *close* to Mr. Devilbiss' and Mr. Macartney's because he did not exhibit any leadership or management role of a group. Mr. Radtke was not an organizer or leader, and he should not receive a corresponding upward role adjustment.

**II.     Mr. Radtke should receive a 2-level downward adjustment for certain zero-point offenders**

A 2-level downward adjustment for certain zero-point offenders applies when the criteria set forth in USSG §§ 4C1.1(a)(1)–(11) are met. The criteria are as follows:

> (1) the defendant did not receive any criminal history points from Chapter Four, Part A;
> (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);
> (3) the defendant did not use violence or credible threats of violence in connection with the offense;
> (4) the offense did not result in death or serious bodily injury;
> (5) the instant offense of conviction is not a sex offense;
> (6) the defendant did not personally cause substantial financial hardship;
> (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
> (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);
> (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense);
> (10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role); and
> (11) the defendant was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

USSG §§ 4C1.1(a)(1)–(11).

Mr. Radtke meets all these criteria and should qualify for this 2-level adjustment. Importantly, Mr. Radtke has zero criminal history points. Regarding criterium (10) ("the defendant did not receive an adjustment under §3B1.1 (Aggravating Role)"), the defense adopts by reference

---

[2] "Ringleader of Global Monkey Torture Network, 'The Torture King', is Charged", BBC, https://www.bbc.com/news/world-us-canada-68716467

7

the argument from Section I above.

Regarding criterium (4), the instant offense did not result in death or serious bodily injury. The plain reading of this criterion is that this refers to human persons, not animals. Given the recency of the "Zero Point Offender" ratification, caselaw on this issue is scarce. Courts are to interpret the Guidelines "using standard canons of statutory interpretation," *United States v. Medina-Campo*, 714 F.3d 232, 236 (4th Cir. 2013.)

Looking at the Guidelines as a whole, under the current Guidelines, "victims" must be "persons." See USSG § 3D1.2 cmt. n.2; see also 18 U.S.C. § 3771(b)(2)(D) (defining "crime victim" for purposes of the Crime Victims' Rights Act). Interpreting "death or serious bodily injury" to include non-humans leads to absurd results. *See Maryland State Dep't of Educ. v. U.S. Dep't of Veterans Affs.*, 98 F.3d 165, 169 (4th Cir. 1996) (describing the absurdity doctrine of statutory interpretation). If the provision is not limited to humans, then it applies to all non-human living organisms that can potentially face "death or serious bodily injury," to include insects, fish, and worms. No standard canon of statutory interpretation provides a limiting principle that allows application of the provision to one set of animals, such as mammals, but not to all other creatures large and small. If the provision *did* apply to non-human organisms, it would lead to the absurd result that it would label as a "victim" both a person who accidentally overdosed on fentanyl supplied by a defendant and his pet gerbil that did the same. As Mr. Radtke did not commit an offense resulting in "death or serious bodily injury," he meets all the criteria in USSG §§ 4C1.1(a)(1)–(11), and he qualifies for a 2-level adjustment as a zero-point offender.

### **Motions for a Downward Departure and Variance:**

Simultaneous with the filing of this Position Paper, Mr. Radtke has filed a Motion for a Downward Departure and a Motion for a Variance below the Guidelines range.

**The Sentence Requested:**

Mr. Radtke is before the Court for sentencing after pleading guilty on September 24, 2024, pursuant to a plea agreement, to one count, charging him with Conspiracy to Create and Distribute Animal Crushing Videos, in violation of 18 U.S.C. §§ 371, 48(a)(2), and 48(a)(3). Sentencing is scheduled for February 13, 2025. The statutory range of imprisonment is zero to 5 years.

The defense asserts that the total offense level should be 16. Mr. Radtke falls under Criminal History Category I, so the proper guidelines range should be 21 to 27 months. The defense asserts that a downward departure and variance from the applicable guideline range is appropriate based on the foregoing considerations discussed below. These considerations, along with the other sentencing factors discussed herein, strongly suggest that a sentence of one year and one day to be served as home confinement within the electronic monitoring program is sufficient but not greater than necessary to achieve the goals of sentencing.

**Argument:**

**III.  Mr. Radtke qualifies for a downward departure from the guideline sentence pursuant to USSG §§ 5H1.1, 5H1.3, and 5H1.11.**

**A.  Age (§ 5H1.1)**

Mr. Radtke's age, combined with his lack of criminal history and high educational attainment, warrant a departure. At sentencing, Mr. Radtke will be 62 years old. (PSR at p. 2). He has no criminal history and is Criminal History Category I. (PSR at p. 36). Intuition and data suggest that offenders at Mr. Radtke's age with no criminal history and graduate degrees are unlikely to recidivate. According to a 2017 US Sentencing Commission report, "[a]ge and criminal history exerted a strong influence on recidivism. For offenders in Criminal History Category I, the rearrest rate ranges from 53.0 percent for offenders younger than age 30 at the time of release to 11.3 percent for offenders

age 60 or older."[3] Mr. Radtke earned both a bachelor's degree in history and a master's degree in educational leadership. (PSR at p. 57). Similarly, "[e]ducation level influenced recidivism across almost all categories.… Among offenders age 60 or older at the time of release, college graduates had a somewhat lower rearrest rate (11.6%) than offenders who did not complete high school (17.2%)."[4] In fact, factoring in his age (62) and education level (college graduate), those in Mr. Radtke's demographic group appear to have the lowest rearrest, reconviction, and reincarceration rate:

Due to his age, Mr. Radtke has an exceedingly low chance of recidivism, and consequently, his

**Recidivism Rates of Recidivism Study Offenders by Education and Age at Release**

| | N | Rearrest % | Reconviction % | Reincarceration % |
|---|---|---|---|---|
| Total | 25,386 | 49.3% | 31.7% | 24.7% |
| **Under 30 Years of Age** | | | | |
| *Education* | | | | |
| Less Than High School | 3,067 | 74.4% | 53.2% | 43.6% |
| High School Graduate | 2,412 | 62.9% | 43.0% | 33.1% |
| Some College | 1,170 | 47.3% | 29.7% | 21.1% |
| College Graduate | 111 | 27.0% | 16.2% | 11.7% |
| **30-39 Years of Age** | | % | % | % |
| *Education* | | | | |
| Less Than High School | 2,849 | 63.0% | 40.9% | 32.8% |
| High School Graduate | 3,269 | 55.0% | 35.0% | 27.0% |
| Some College | 1,923 | 44.1% | 26.1% | 18.5% |
| College Graduate | 433 | 21.5% | 11.8% | 7.4% |
| **40-49 Years of Age** | | % | % | % |
| *Education* | | | | |
| Less Than High School | 1,679 | 51.5% | 30.9% | 24.0% |
| High School Graduate | 2,319 | 45.0% | 28.6% | 22.2% |
| Some College | 1,313 | 37.9% | 24.1% | 18.1% |
| College Graduate | 543 | 21.2% | 12.5% | 8.7% |
| **50-59 Years of Age** | | % | % | % |
| *Education* | | | | |
| Less Than High School | 698 | 31.0% | 18.2% | 14.6% |
| High School Graduate | 953 | 30.6% | 16.2% | 12.5% |
| Some College | 744 | 24.9% | 12.2% | 9.8% |
| College Graduate | 551 | 16.5% | 8.2% | 5.8% |
| **60 Years of Age or Older** | | % | % | % |
| *Education* | | | | |
| Less Than High School | 348 | 17.2% | 9.5% | 7.2% |
| High School Graduate | 356 | 18.8% | 11.2% | 7.9% |
| Some College | 249 | 16.1% | 8.4% | 6.0% |
| College Graduate | 241 | 11.6% | 5.8% | 4.2% |

---

[3] *The Effects of Aging on Recidivism Among Federal Defenders*, US Sentencing Commission (Dec. 2017).
[4] Id.

sentence should be well below the guidelines range.

### B. Mental and Emotional Conditions (§ 5H1.3)

Mr. Radtke suffers from PTSD, panic attacks, and depression, which are all diagnosed. (PSR at p. 51) These stem from childhood trauma—for which he could not control—and military service—for which he should be commended. (Id.) He has been prescribed Zoloft, Xanax, Paxil, and Cymbalta for his conditions. (Id.) Mr. Radtke has sought and obtained therapy over the past 20 years, including three instances where he attended treatment for longer than one year. (Id.) Most recently, Mr. Radtke began seeing his current therapist in November 2022, which was before he became aware of the instant charges or investigation. (Id.) Mr. Radtke's mental and emotional condition warrant a departure.

### C. Military Service (§ 5H1.11)

Mr. Radtke's military service and his resulting diagnosed PTSD warrant a departure from the guidelines. The Sentencing Guidelines provide that "[m]ilitary service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." USSG § 5H1.11.

Mr. Radtke decided to serve his country and joined the military a few years after graduating high school. (PSR at p. 63) He enlisted in the United States Army in 1984, serving on active duty until 1987. (Id.) While on active duty, he rose to the rank of Specialist (E-4) and served as a military policeman and nuclear security specialist. (Id.) After his active-duty service, he joined the Army Reserves. (Id.) Mr. Radtke earned an honorable discharge in 1990. (Id.) During his time as a military service-member, Mr. Radtke earned numerous awards, including two Army Achievement Medals, an Army Service Ribbon, an Overseas Service Ribbon, and a Good Conduct Medal—an award only received for honorable service without any record of misconduct. (PSR at p. 63)

Mr. Radtke's patriotism was not without sacrifice: he was diagnosed with PTSD from his military service (and childhood trauma, discussed below). (PSR at p. 52) From July 1984 to February 1985, Mr. Radtke worked as a military police officer on a base where he responded to suicides, attempted suicides, and domestic assaults. (Id.) In one incident, he responded to a car accident and witnessed a victim's bones sticking out of their skin. (Id.) During the mid-80s, Mr. Radtke was stationed overseas and, as a part of his duties guarding a storage unit missile, he was locked in a room for 24 to 72 hours. (Id.) This isolating experience lasted half of the time during his 22 months overseas in that role. (Id.) His service and resulting sacrifice warrants a departure from the guidelines and consideration from this Court when fashioning the appropriate sentence.

### IV.     **A variance is warranted pursuant to the sentencing factors in 18 U.S.C. 3553(a).**

The United States Sentencing Guidelines are advisory, not mandatory. *U.S. v Booker,* 543 U.S. 220 (2005.) As a matter of substance, the Court is only required to impose a sentence "sufficient, but not greater than necessary to comply with the deterrent, security, remediation, and retribution purposes underlying 18 U.S.C. §3553(a)(2)." Procedurally, the Court is also obligated to consider the factors articulated in 18 U.S.C. §3553 (a) when pronouncing a sentence.
*U.S. v. Barron*, 557 F.3d 866, 868 (8th Cir. 2009.)

The Supreme Court held in *Booker* that this mandatory system was inconsistent with the Sixth Amendment. *Booker*, 543 U.S. 220 (2005). To bring the Guidelines in line with that amendment, the Court held that the entirety of 18 U.S.C. § 3553(b)(1)—the provision that required courts to "impose a sentence of the kind, and within the range" directed by the Guidelines—must be "severed and excised" from the Act. (Id.) at 245, 125 S.Ct. 738. The Court explained that the Act, as passed, created a mandatory Guidelines system, but that in light of its Sixth Amendment holding that choice was not open to Congress. (Id.) at 265, 125 S.Ct. 738. The Guidelines could stay, but by severing the

"provision of the federal sentencing statute that makes the Guidelines mandatory," the Court established that they are "effectively advisory." (Id.) at 245, 125 S.Ct. 738. And in so doing, *Booker* restored much of the district courts' traditional sentencing discretion.

Still, the Guidelines are not irrelevant. After *Booker*, a sentencing court must "consult those Guidelines and take them into account when sentencing"—what we have described as establishing the "procedural reasonableness" of a sentence—but the Guidelines are no longer the final consideration. (Id.) at 264, 125 S.Ct. 738; *See also United States v. Sarras*, 575 F.3d 1191, 1219 (11th Cir. 2009). Instead, a district court now has the freedom to "tailor the sentence in light of other statutory concerns," and a judge can choose an outside-Guidelines sentence so long as the judge has considered, and the sentence reflects, the factors outlined in § 3553(a): the nature and circumstances of the crime, the need for the sentence imposed, the kinds of sentences available, and the like. *Booker*, 543 U.S. at 245, 125 S.Ct. 738. So while many guidelines use the terms "must" or "shall," that language simply requires courts to properly consider them when deciding the advisory Guidelines recommendation—it does not render them mandatory when imposing the final sentence. *See Sarras*, 575 F.3d at 1209 n.22., *United States v. Henry*, 1 F.4th 1315, 1320–21 (11th Cir. 2021), *cert. denied,* 142 S. Ct. 814 (2022.)

This Court is not required, however, to consider any factor or combination of factors to be determinative in an individual case. (Id.) 18 U.S.C. §3553(a) contains seven factors to be considered:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and the provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;

13

(4) the kinds of sentences and sentencing range established by the Sentencing Commission for the applicable categories of offense and defendant;

(5) any applicable and pertinent policy statement issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. §3353 (a).

In the present case, a consideration of the factors set forth in 18 U.S.C. §3553(a) demonstrate that a sentence of one year complies with the policy goals set forth in 18 U.S.C. §3553(a)(2). As such, Mr. Radtke should be given a variance for a lesser sentence.

**A. The History and Characteristics of the Defendant**

Mr. Radtke is a 62-year-old man with no criminal history, a military veteran who served honorably in the armed forces, and a man who understands that his PTSD and self-hate caused by an abusive mother undoubtedly led him down a dark path to the commission of cruelty towards animals. He is ashamed of his actions, has fully accepted responsibility for those actions, and is committed to reforming his life.

Jeffrey Phillip Radtke was born on November 5, 1962 in Mankato, Minnesota, to Phillip Radtke and Diane Radtke. (PSR at p. 40) Mr. Radtke has two younger siblings: Jenifer Bouadion (nee: Radtke), age 59, and Jayson Radtke, age 53. (Id.) Growing up, his mom stayed at home while his dad worked. (Id.) Mr. Radtke was raised in North Mankato, Minnesota until he was 7 years old, when his family moved to Bloomington, Minnesota. (PSR at p. 41) This is where he graduated from high school. (Id.) His parents divorced when he was 16 years old. (PSR at p. 40)

Sadly, Mr. Radtke was abused as a child. Mr. Radtke's mother physically and emotionally abused him. (PSR at p. 42) The emotional abuse began when he was 3 years old. The physical abuse started when he was about 7 years old. (Id.) His mom verbally beat him down, frequently

calling him names. Mr. Radtke's mother would slap him, beat him, and often use objects to inflict physical abuse on him. (Id.) Mr. Radtke was often beat with a wooden board two and a half feet long and two inches wide. He was hit so hard that his legs would temporarily stop functioning in reaction to the pain. When his dad inflicted this pain on Mr. Radtke, his mom laughed at him. On one occasion, his mother hit Mr. Radtke in the face with a hot spoon. (Id.)

Mr. Radtke's siblings corroborated the physical and emotional abuse and confirmed that he, as the eldest, suffered the "brunt of it." His sister reported that she did not get hit with block of wood, but when Mr. Radtke was taken out back by their father for his beatings, she could hear him scream.

Mr. Radtke was also sexually abused. (PSR at p. 43) The sexual abuser was a family member outside his immediate family. (Id.) Like so many child sexual abuse victims, Mr. Radtke did not report or tell anyone until he was an adult. (Id.) He did choose to tell his mother. Her response was, sadly, in line with her life-long pattern of over-criticizing and under-valuing him: she asked him, "did you fight [against the abuser]?" (Id.)

Mr. Radtke chose to deal with his berating mother and toxic home the best way he could at the time: distancing himself from that reality. He got out of the house as soon as he could and began working. Mr. Radtke began working in high school, working jobs at Godfathers Pizza and at a gas station. He also poured himself into a life passion of his: guitars and music. He took guitar lessons. Partly due to his persistence and partly because of his need to get out of the house, on one occasion, in order to get to his guitar lessons, he walked six blocks on crutches with a broken leg in a cast.

Mr. Radtke graduated from high school in 1981 from Bloomington Lincoln Senior High School in Bloomington, Minnesota. (PSR at p. 57) Mr. Radtke decided to serve his country and joined the military, as discussed above. As a middle-aged man, Mr. Radtke earned a bachelor's degree in history in 2007 from Metropolitan State University with a GPA of 3.59. He then earned

a master's degree in educational leadership in 2017 from Augsburg University with a GPA of 3.65. Since 2021, Mr. Radtke has been employed full-time as a security professional at a private college preparatory school in Saint Paul, Minnesota. (PSR at p. 60)

The mental and psychological scar from his upbringing clings to Mr. Radtke today. In 1995, he was diagnosed with post-traumatic stress disorder ("PTSD"), from both his childhood trauma and military service. (PSR at p. 51) He suffers from diagnosed panic attacks and depression. (Id.) For these diagnoses, Mr. Radtke has been prescribed Zoloft, Xanax, and Paxil. (Id.) Long ago, Mr. Radtke realized that he needed help for his mental health issues. Over the past 20 years, he's participated in counseling "on and off." (Id.) There have been at least three occasions where he attended counseling for longer than a year. (Id.) For the past two years, Mr. Radtke has engaged in telehealth counseling in which he has weekly sessions. (Id.) Mr. Radtke has also been diagnosed with heart disease, left ventricular hypertropia, high blood pressure, and Raynaud's syndrome. (PSR at p. 50) This syndrome causes him significant pain in his limbs. (Id.) Mr. Radtke has prescriptions for his high blood pressure and heart disease. (Id.)

Since 2007, Mr. Radtke has been in a long-term relationship with his significant other, Nicole Goerger. (PSR at p. 45). Ms. Goerger has a son, and Mr. Radtke has been in his life since he was 7 years old. (Id.) He told Mr. Radtke that he views Mr. Radtke as more of a father figure than his biological father. (Id.) Mr. Radtke maintains a close relationship with his younger sister Jenifer and younger brother Jayson. Both his siblings have boys, and Mr. Radtke has been and will be involved in the lives of his nephews. For example, for his brother Jayson's sons, Mr. Radtke hand-built them guitars and gave them guitar lessons when they were teenagers.

Mr. Radtke remorsefully acknowledged his criminal behavior and accepted responsibility for his actions. Mr. Radtke is fully aware that he engaged in a conspiracy that had the object goal of heinous acts against innocent animals. Without making excuses, Mr. Radtke understands *why*

16

he did it: his self-hate, depression, and feelings of worthlessness—deriving from his childhood trauma—led him to sadistically see *himself* in the tortured animals. Mr. Radtke is aware of the intense irony that he was an innocent child abuse victim, and his actions led to the torture of innocent animal victims. Mr. Radtke is ready to piece together the fragmented aspects of his life by organizing those pieces into a pathway for healing and rehabilitation.

### B. The Need to Avoid Unwarranted Sentencing Disparities

A sentence below the guidelines range is needed to avoid unwarranted sentencing disparities. There are few similarly situated defendants to Mr. Radtke, but some of his co-conspirators have been sentenced across the country. As briefly discussed above, in perhaps the most analogous case to Mr. Radtke, a defendant received a one year and one day sentence. In *United States v. Herrera*, Case No. 23-CR-76-WMC (W.D. Wis. 2022), Kenneth Herrera was sentenced to one year and one day where he, similar to Mr. Radtke, transferred money and sent detailed instructions to the Indonesian videographer regarding specific ways the monkey should be physically abused. Unlike Mr. Radtke, Mr. Herrera did not present with the many grounds for departure and variance.

In other cases where defendants received sentences greater than one year and one day, the defendants engaged in activity distinguishable from—and more grotesque than—Mr. Radtke. In *United States v. Scott* 1:21-cr-49-SEB-DLP (S.D. Ind.), Krystal Cherika Scott was sentenced to 30 months imprisonment for personally slaughtering 21 animals live on social media, including dogs, cats, and kittens. In *United States v. Noble*, 6:23-cr-181-MC (D. Or. 2023), David Christopher Noble was sentenced to 48 months. In *United States v. Devilbiss*, Case No. 23-CR-(S1)-153 WWB-LLL (M.D. Fl. 2023), Ms. Devilbiss received a 51-month sentence, but that was because, as discussed above, she was assessed an aggravating role enhancement as a leader or organizer—an enhancement that should not apply to Mr. Radtke. Finally, in *United States v. Macartney*, Case No. 24-CR-25 EWH-LRL (E.D. Va. 2023), Michael Macartney received a 40-month sentence where, as discussed

17

above, he gave himself the moniker "The Torture King" and was properly assessed an aggravating role enhancement. A sentence below the guidelines range for Mr. Radtke is necessary to avoid unwanted sentencing disparities.

**C. Nature and Circumstances of the Offense.**

This offense involved Mr. Radtke participating in an online group that shared grotesque videos of monkeys being tortured. Mr. Radtke shared these disturbing videos and sent money to a videographer in Indonesia, which was his role in the conspiracy. Mr. Radtke takes full responsibility for his role in the offense. It is important to note that Mr. Radtke received no economic benefit from the conspiracy, nor did he hold any leadership or managerial role. He did not create trading groups. He did not recruit members. In a hard-to-understand-way, participating in the offense was cathartic for Mr. Radtke. He felt some semblance of power and control, and, as discussed above, saw *himself* in the monkeys as they were tortured.

The phenomena of traumatized people exposing themselves to situations reminiscent of their original trauma is scientifically documented.[5] Known as "repetition compulsion," this process of re-living prior abuse by watching violence against animals is an unconscious process that provides a temporary sense of mastery and pleasure. *Id.* Ultimately, this perpetuates a sense of helplessness. Mr. Radtke is aware of the ways in which his past trauma impacts his current behavior, and he is committed to treatment and counseling. Mr. Radtke continues to vocalize his desire to seek treatment, therapy, and to change. In this respect, he has demonstrated psychologically that he has gained insight and clarity that what he did was wrong. He understands the gravity of the offense and is ready to move forward and away from the dark shadows of his past.

---

[5] Bessel A. van der Kolk, MD PSYCHIATRIC CLINICS OF NORTH AMERICA, Volume 12, Number 2, Pages 389-411, June 1989. *The Compulsion to Repeat the Trauma Re-enactment, Revictimization, and Masochism.*

**Conclusion:**

This Court has ample reason to depart from the Guidelines because of Mr. Radtke's age, his mental and emotional conditions, and his military service. Mr. Radtke committed terrible offenses for which he accepted full responsibility. For all the reasons stated above, Mr. Radtke deserves a downward departure from the Guidelines and instead should be sentenced to a term of imprisonment of one year and one day to be served as home confinement, with electronic monitoring if deemed appropriate by the court.

Due consideration of the factors set forth in 18 U.S.C. §3553(a) warrants imposition of a variance and a sentence more lenient than would result from a mechanical application of the Sentencing Guidelines. A downward variance from the Guidelines is certainly in line with the mandate of 18 U.S.C. §3553(a)(2). Accordingly, Mr. Radtke alternatively and respectfully requests the Court grant a variance and sentence Mr. Radtke to a term of imprisonment of one year and one day to be served as home confinement.

Respectfully submitted,

GROSHEK LAW

Dated this thirtieth day of January 2025.

/s/
Christa J. Groshek, Esq.
302 N. 10th Ave
Minneapolis, MN 55401
Tel (612) 827-3833
christa@grosheklaw.com

Trey Kelleter, Esq.
101 W. Main Street, Suite 101
Norfolk, VA 23510
Tel. (757) 500-7666
Attorneys for Jeffrey Radtke, Defendant.

**CERTIFICATE OF SERVICE**

I certify that on January 30, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification to all counsel of record.

/s/
Trey R. Kelleter, Esq.
VSB #41606
KelleterLaw PC
101 W. Main Street, Suite 100
Norfolk, Virginia 23510
Phone: (757) 500-7666
Email: trey@kelleterlaw.com